Marsha VIVERITO, Individually and on behalf of her minor children Adam and Jason, and on behalf of all others similarly situated, Plaintiffs,

and

Margarita Franciscovitch, Individually and on behalf of her minor child Linda, William Banister, and Joanne Agoglia, Individually and on behalf of her minor children Desiree and Christopher, and on behalf of all others similarly situated, Plaintiffs-Intervenors,

v.

J. Henry SMITH, Individually and as Commissioner of the New York City Department of Social Services, and Philip L. Toia, Individually and as Commissioner of the New York State Department of Social Services, Defendants.

No. 76 Civ. 4151.

United States District Court, S. D. New York.

July 6, 1979.

See also, D.C., 421 F.Supp. 1305.

Kalman Finkel, Civ. Div., The Legal Aid Society, John E. Kirklin, Constance P. Carden, The Legal Aid Society, Civ. Appeals & Law Reform Unit, New York City, Joan Mangones, Marshall W. Green and David Goldfarb, Staten Island, N. Y., of counsel, The Legal Aid Society, for plaintiffs.

Allen G. Schwartz, Corp. Counsel, New York City, for City defendants; Joseph Bruno, George Gutwirth, New York City, of counsel.

Robert Abrams, Atty. Gen., New York City, for defendant Philip L. Toia; Ellen Marks, Asst. Atty. Gen., New York City, of counsel.

LASKER, District Judge.

Among other forms of public assistance, New York State provides aid in the form of shelter allowance to all persons who fall within a certain category of need. N.Y.Soc.Serv.Law § 131–a (McKinney 1976) In August of 1976, in an attempt to distribute limited funds more broadly, New York's Department of Social Services revised its regulations governing shelter allowance to abandon its previous method of allocation based on individual need in favor of new fixed maxima for each social services district based on family size alone. 18 N.Y.C.R.R. § 352.3(a) (as amended August 31, 1976) In the same year, the New York legislature revised the eligibility requirements for Home Relief, a public assistance program maintained solely by New York State, to require participants under the age of 21 to obtain a disposition in a support proceeding against all legally responsible relatives as a condition to receiving aid. N.Y.Soc.Serv.Law § 158 (McKinney 1976)

Plaintiffs, who are participants in a variety of poverty level public assistance programs, do not contest the validity of these changes in assistance; they challenge the manner in which the amendments in the law have been implemented. Specifically, they challenge § 358.8(c)(1) of New York's Social Services regulations, 18 N.Y.C.R.R. § 358.8(c)(1), which authorizes the City and State Departments of Social Services to terminate, suspend or reduce continued assistance to welfare recipients prior to a "fair hearing" decision in all cases in which defendants determine that a change in aid raises no questions of fact but is based solely on a change in law or policy. Plaintiffs seek to have the regulation permanently enjoined and declared unconstitutional under the due process and equal protection clauses of the Fourteenth Amendment. In addition, those plaintiffs who participate in programs funded in part by the federal government, and therefore subject to federal regulation, contend that, as applied to them, § 358.8(c)(1) is invalid under the Social Security Act, 42 U.S.C. § 601 *et seq.,* and the regulations promulgated pursuant to the Act. See 45 C.F.R. § 205.-10(a) (1978).

I.

### A. History of the Litigation

On October 26, 1976, the plaintiff class was certified to include all recipients of public assistance benefits in New York State under the programs Home Relief, Aid to Dependent Children (ADC), Aid to the Aged, Blind or Disabled (AABD), Veterans' Assistance (VA) and Medical Assistance (Medicaid).

Home Relief, a form of general public assistance, is funded and administered solely by New York State. The plaintiffs' sole claim as to this program is that it is being administered in violation of their federal due process rights. The four remaining programs to which the class members belong are federally funded, and plaintiffs claim that these programs are being administered in violation of the federal Constitution and also the Social Security Act and its regulations. Assistance in the form of shelter allowance is available as part of several of the programs involved in this suit. Section 131–a of New York's Social Services law, which governs shelter allowance, specifies that this form of relief is available to

recipients of Home Relief, Aid to Dependent Children, and Veterans' Assistance. In addition, New York's statute governing Aid to the Aged, Blind or Disabled indicates that shelter allowance may be available to persons in those categories as well. See N.Y.Soc.Serv.Law §§ 250, 255.[1]

At the time of class certification, plaintiffs also sought a preliminary injunction against implementation of the "law or policy exception" of 18 N.Y.C.R.R. § 358.8(c)(1). Finding that all four representatives of the plaintiff class had been denied "aid continuing" even though they raised factual questions which might have entitled them to relief, we held that plaintiffs asserted substantial questions "presenting a fair ground for litigation as to whether the 'fact/policy' distinction applied by the state is 'inherently unworkable' as a means to achieve the requirements of procedural due process." 421 F.Supp. 1305, 1310 (S.D.N.Y.1976). Accordingly, defendants were preliminarily enjoined from applying the "law or policy exception" to deny aid continuing to any member of the plaintiff class "who timely requests a fair hearing decision on a proposed reduction, termination or suspension of benefits . . ."[2]

In July of 1977, plaintiffs moved for summary judgment under Rule 56, Fed.R.Civ.P. In their statement of "material facts as to which . . . there is no genuine issue to be tried", submitted in accordance with local rule 9(g), plaintiffs incorporated by reference all of the findings of fact made in connection with the application for a preliminary injunction as well as 105 affidavits from members of the plaintiff class who had received notice from defendants that their benefits would be reduced and who attested to issues of fact which might entitle them to prevail at a fair hearing. The motion was denied on the ground that disposition of the matters at issue required testimony subject to cross examination. At trial, testimony was heard from 20 members of the plaintiff class and from experts, called by both sides, on New York's public assistance programs. Plaintiffs now renew their request for relief either in the form of summary judgment, pursuant to Rule 65, Fed.R.Civ.P., or judgment after trial.

### B. The State Regulation

18 N.Y.C.R.R. § 358.8(c) applies to "any proposed action to discontinue or reduce assistance payments, [or] medical assistance authorization . . ." It provides that, in cases in which there is a request for a fair hearing within the advance notice period:

"(1) Assistance shall be continued until the fair hearing decision is rendered and through a period consistent with the established policies for issuance of payments or authorization except in a case in which the department has determined, in accordance with Federal requirements, that the issue is one of State policy (including law and department regulations) and neither one of fact or judgment, nor whether the State's policies (including law and department regulations) were correctly applied to the facts of the particular case.

\*     \*     \*     \*     \*     \*

1. N.Y.Soc.Serv.Law § 250.2 which sets out a "declaration of object" for services to the Aged, Blind or Disabled provides broadly:

   "When used in this title, services shall be construed to include, but not be limited to, protective services, health-related services, self-support services for the handicapped, homemaker services, housekeeping services, special services for the blind, housing improvement and assistance services, home delivered meals, home management and other functional educational services, services to adults requiring care in suitable substitute homes, family planning services and such other services as may be necessary to accomplish the purposes of this title."

§ 255.2, which sets out the "character and adequacy of services" provides:

   "The amount and nature of the services and the manner of providing them, shall be determined by the social services officials with due regard to the conditions existing in each case, and in accordance with the regulations of the department."

2. Excluded from the class were recipients of Home Relief who raised no factual question other than whether a Family Court order had been obtained. 421 F.Supp. 1305, 1313 (S.D.N.Y.1976).

(2) On receipt of a request for a fair hearing the department shall promptly decide whether the case is one that requires assistance to be continued, or does not require that assistance be continued because the issue is one of State policy (including law and department regulations), and the department shall promptly advise the appropriate social services official and the recipient accordingly."

In August of 1976, defendants applied the provisions of § 358.8(c)(1) to approximately 30,000 recipients of shelter allowance who were notified that their benefits were about to be reduced pursuant to the new rent ceilings set out in the Social Services regulations. See 18 N.Y.C.R.R. § 352.3(a).[3] The notices sent to the shelter allowance recipients advised them that a "fair hearing" to contest the reduction in benefits could be obtained if requested within sixty days. However, the notices did not specify that there were any circumstances under which aid could be continued until the time of the hearing.

Shortly thereafter, defendants again applied the challenged regulation, this time to implement the amendments to the Home Relief statute. Notice was sent to approximately 11,000 recipients of Home Relief that assistance would be discontinued unless a final disposition in a support proceeding had been secured, or the recipient fell within one of six specified exceptions to the new law. Recipients were advised to fill in and send to the State Department of Social Services a questionnaire, on the back of the notice form, which would assist the State in deciding whether a recipient was excepted from the operation of the statute and therefore entitled to continuing aid. Although the amendment to the Home Relief statute was subsequently held to violate the State constitution, and defendants were enjoined from its implementation, *Tucker v. Toia*, 43

N.Y.2d 1, 400 N.Y.S.2d 728, 371 N.E.2d 449 (1977), some 2600 questionnaires were received by the State (Tr. Sept. 21) * and assistance to a number of recipients was temporarily suspended (Tr. Aug. 235, 245, 274, 281).

Finally, in December of 1977, the New York City Department of Human Resources issued further notices of shelter allowance reductions to 3,000 recipients of public assistance. These notices were substantially the same as those sent previously to shelter allowance recipients: they advised of a new fixed maxima of the right to request a hearing, but did not mention the possibility of aid continuing.

The State concedes that no attempt was made to inform recipients of shelter allowance of the possibility of aid continuing because it had concluded that the reductions raised no questions of fact and therefore, under 18 N.Y.C.R.R. § 358.8(c)(1), the recipients were, as a matter of law, not entitled to a continuation of benefits until a hearing. (Testimony of Peter Mullany, Tr. Sept. 26) However, plaintiffs contend that the shelter allowance reductions raised the following three factual issues which might have entitled a recipient to prevail at a fair hearing: estoppel, excessive hardship and erroneous computation of family size. Moreover, although defendants did attempt by means of the questionnaire to distinguish, prior to discontinuance, between those recipients of Home Relief who fell within the operation of the new statute, N.Y.Soc.Serv.Law § 158, and those who did not, plaintiffs assert that the questionnaire was totally inadequate for that purpose.

## II.

### *The Testimony at Trial*

#### A. *Shelter Allowance*

A number of class members testified at trial as to the factual questions created in

---

**3.** The regulation adopted by the Department of Social Services fixing maximum shelter allowances was found constitutional and consistent with the governing state statute, N.Y.Soc. Serv.Law § 131–a, in *Bernstein v. Toia*, 43 N.Y.2d 437, 402 N.Y.S.2d 342, 373 N.E.2d 238 (1977).

* The transcript is referred to as either "Tr. Aug." or "Tr. Sept." depending on whether the reference is to the August or September hearing date.

their cases by the shelter allowance reductions.[4]

### Estoppel

Six witnesses testified on the issue of estoppel. A good example was Carmen Otoya, the mother of one child, who stated that at the time she applied for public assistance the City Department of Social Services agreed to pay $183. per month toward the cost of her mortgage and in consideration for this commitment placed a lien on her house for $7,300. Despite this agreement, her assistance was reduced to $160. per month in February of 1977. (Tr. Aug. 123–131) Maria Pagan testified that before she signed her lease, she consulted with her caseworker about whether she would receive enough money to pay her rent. When she was told that she would receive $185. per month, she signed the lease and submitted it to the Department for approval. Several months later, she was notified that her assistance would be reduced to $152. per month. (Tr. Aug. 207–12) See also, testimony of Marilyn Meyer (Tr. Aug. 108–23); Angelina Padilla (156–74); Robert Carter (174–88); Edward Mozes (306–24).

### Hardship

Several of the same witnesses testified about the hardships which the reductions in their assistance created for them. Ms. Pagan stated that, in order to meet her rent payments out of her reduced budget, she and her daughter were no longer able to buy clothes and that the only food which they purchased was that which they could obtain with their food stamps. (Tr. Aug. 213) Ms. Otoya testified that her gas and electricity were cut off and restored only after she received a recoupable advance from the Department of Social Services which she then paid off through further reductions in her assistance. (Tr. Aug. 132–33) Similarly, Angelina Padilla, to prevent being evicted from the apartment in which she and her three children lived, sought a recoupable advance which then was deducted from subsequent welfare checks. (Tr. Aug. 170–71) See also testimony of Robert Carter (Tr. Aug. 175–78); Edward Mozes (316–321)

### Erroneous Computation of Family Size

Cynthia Watkins testified on the issue of error in computation of family size. She stated that in March of 1976, when she was eight months pregnant, she applied for public assistance and subsequently received shelter allowance in the amount of $172. semi-monthly to support herself and her child. In February of 1977, she was notified that this would be reduced to the amount normally paid to one person. (Plaintiff's Exhibit 8) Although after she advised the Department of its error as to the size of her family, the benefits were restored to the correct amount, she never received retroactive payments for the months during which she was paid at the lower rate. (Tr. Aug. 189–93) Plaintiffs also rely on a number of fair hearing decisions, received in evidence, which establish errors by the City Department in computing a recipient's family size. See Plaintiff's Exhibits 39 and 40; State Defendant's Exhibits D, F, G, and I.

### B. Home Relief

The bulk of the witnesses at trial were recipients of Home Relief. Their testimony was directed at alleged flaws in the questionnaire which defendants devised to determine whether a recipient fell within one of the six exceptions to the amended Home Relief statute. The questions included: the recipient's age ( # 1); the names of all legally responsible relatives ( # 2); whether any of these relatives were dead ( # 3); were themselves on welfare ( # 4); whether the recipient lived with these relatives ( # 5); or whether the recipient had received a Family Court disposition against his legally responsible relatives ( # 7). The

---

**4.** The only shelter allowance recipients to testify at trial were recipients of ADC and Home Relief.

testimony indicated that a number of witnesses misunderstood the questions and therefore failed to supply information necessary to the State's determination. For instance, Paulette Brown testified that she did not list her father as a legally responsible relative because he had never married her mother or acknowledged his paternity. (Tr. Aug. 241–44) Two other witnesses testified that they had failed to indicate that their parents received food stamps because they did not realize that this information was responsive to the question whether their relatives were "receiving public assistance." (Tr. Aug. 269, 280–81; Plaintiffs' Exhibits 17, 18, 19) One witness testified that she did not indicate that her mother had a court order of support for her because she did not understand the word "disposition". (Tr. Aug. 225) Another witness stated that, although she was living with both of her parents, she listed only one on the form because the question "[a]re you living with one of your legally responsible relatives" referred to only *one* relative and was followed by only one line in which to write the answer. (Tr. Aug. 234)

Further testimony from the Home Relief recipients indicated that other factors relevant to the recipient's status were not dealt with at all by the questionnaire. For instance, the questionnaire did not address situations in which: (1) a "father" is not legally responsible because he had never supported the recipient, acknowledged paternity or had been adjudged to be the father (Tr. Aug. Brown 241–44; Garcia 304–05; Williams 201–03A); (2) a relative has been missing for so long that he or she may be presumed dead (Villanueva 261–62; West 285–87); or (3) the parent of a recipient over the age of 18 is not legally responsible because he or she lives in a state or foreign country in which parents are not required to support their children after they have reached the age of 18 (Puentes 142–45; Todman 291–95).

Plaintiffs assert that the testimony and documentary evidence at trial establish that the fact/policy distinction embodied in 18 N.Y.C.R.R. § 328.8(c)(1) is "unworkable" since defendants were unable to identify accurately, prior to a hearing, which reductions in benefits raised issues of fact or judgment and which raised only questions of law or policy. They further contend that the experience in the Home Relief context indicates that the use of documentary aids, such as the questionnaire, does not increase the accuracy of defendants' determinations.

### III.

*The Federal Regulations*

As stated above, four of the welfare programs to which the class members belong—Aid to Dependent Children, Veterans' Assistance, Aid to the Aged, Blind or Disabled, and Medicaid—are funded at least in part by the federal government. Class members who receive funds under these programs seek to have § 358.8(c)(1) enjoined and declared invalid under the regulations promulgated pursuant to the Social Security Act insofar as it denies "aid continuing" pending a hearing decision to any recipient even where a timely request for a fair hearing has been made.[5]

The applicable federal regulation, 45 C.F.R. § 205.10(a), provides that "timely and adequate notice" shall be given whenever assistance is terminated, suspended or reduced. "Adequate" is defined to consist of:

"written notice that includes a statement of what action the agency intends to take, the reasons for the intended agency action, the specific regulations supporting such action, explanation of the individual's right to request an evidentiary hearing (if provided) and a State agency hearing, *and the circumstances under which assistance is continued if a hearing is requested ;*"

§ 205.10(a)(4)(i)(B) (emphasis added).

The regulations also provide that:

"An opportunity for a hearing shall be granted to any applicant who requests a

---

5. The only evidence in the record as to changes in assistance specifically affecting these class members is the testimony of ADC recipients whose shelter allowance was terminated.

hearing because his claim for financial or medical assistance is denied, or is not acted upon with reasonable promptness, and to any recipient who is aggrieved by any agency action resulting in suspension, reduction, discontinuance or termination of assistance. *A hearing need not be granted when either State or Federal law require automatic grant adjustments for classes of recipients unless the reason for an individual appeal is incorrect grant computation.*"

§ 205.10(a)(5) (emphasis added).

Subparagraph (v) of this last provision adds that:

"The agency may deny or dismiss a request for a hearing . . . where the sole issue is one of State or Federal law requiring automatic grant adjustments for classes of recipients . . ."

Finally, § 205.10(a)(6) provides, in relevant part, that

"If the recipient requests a hearing within the timely notice period:

(i) Assistance shall not be suspended, reduced, discontinued or terminated, (but is subject to recovery by the agency if its action is sustained), until a decision is rendered after a hearing, unless:

(A) A determination is made at the hearing that the sole issue is one of State or Federal law or policy, or change in State or Federal law and not one of incorrect grant computation; . . ."

Plaintiffs rely on this last provision, § 205.10(a)(6), as authority for their claim that federal law requires continuation of benefits whenever a hearing is requested. However, the regulation does not in fact establish such an unconditional requirement. Plaintiffs' reading fails to consider that § 205.10(a)(6) is modified by the terms of the preceding subsection, § 205.10(a)(5), which specifies that, in the event of an automatic grant adjustment, a hearing (and therefore aid continuing) need not be provided unless a recipient alleges that the state agency has made an error in computing his grant. *Becker v. Blum*, 464 F.Supp. 152 at 157 (S.D.N.Y. 1978); *Budnicki v. Beal*, 450 F.Supp. 546, 553–54 (E.D.Pa.1978).

However, although the federal regulations do not extend as far as plaintiffs assert, they clearly require greater safeguards for federally funded programs than are presently set out in 18 N.Y.C.R.R. § 358.8(c)(1). At a minimum, defendants are required by the federal regulations to notify recipients that if they request a hearing within the ten day "timely notice period" [6] and assert an error in computation, aid will be continued at least until the hearing. *Turner v. Walsh*, 435 F.Supp. 707, 714 (W.D.Mo.1977).[7] But see, *Prouse v. Blum*, No. 78 Civ. 448, slip op. at 4 (S.D.N.Y. August 20, 1978); *Burlingame v. Schmidt*, 368 F.Supp. 429, 433 (E.D.Wisc.1973).[8]

Nevertheless, defendants argue that no individual fact questions were presented by the reductions in shelter allowance, and therefore no provision for aid continuing was necessary under the regulations. Information as to family size was already on file with the City Department of Social Services and the City contends that since, even before the 1976 reductions, aid was computed in part on the basis of household size, recipients could reasonably have been expected to keep this information up-to-date. As to plaintiffs' claim that they

---

**6.** 45 C.F.R. § 205.10(a)(4)(i)(A).

**7.** In *Turner*, the court found that:

"the regulations clearly contemplate that if a recipient requests a hearing within ten days of the notice, his/her benefits will continue at their present level until a decision is rendered after the hearing, unless at the time of the hearing, a determination is made that the only issue involved is one of state or federal law or policy. In that event, the benefits, having continued from the date of notice, would terminate as of the date of the hearing. In no event—given a hearing request within

ten days of notice raising an alleged error in grant computation—do the regulations contemplate termination of benefits prior to the hearing."

**8.** In both *Prouse* and *Burlingame*, the court found that plaintiffs were entitled under the federal regulations to a continuation of benefits whenever a hearing was requested. Neither court addressed the limitation in the federal regulations on aid continuing in the context of an "automatic grant adjustment".

should have been afforded the right to present facts relating to estoppel and hardship at a fair hearing, defendants argue that, as a matter of law, these factors are unavailable as grounds to contest reductions in aid.

The defendants' position is not persuasive. The fact that information as to family size was on file with the Department of Social Services does not remove the possibility of such information being in error. As Dr. James Dumpson, the former City Commissioner of Social Services testified, welfare recipients are interviewed by the Department only twice a year, and their circumstances may well change between visits. Dumpson also stated that, during his tenure as Commissioner, the backlog of correspondence was so great that "clients wrote to us, told us something that had happened in their circumstances six months earlier, and it was not brought to our attention until the face-to-face recertification." Moreover, he noted that error is always possible in the transmission of information by the income maintenance worker from the recipient into the computer for storage. (Tr. Aug. 39–40)

While the evidence relied on by plaintiffs indicates that the number of errors in computation of family size which were brought to defendants' attention was small in proportion to the total size of the class, this factor is irrelevant for purposes of the federal regulations which require that, even in the case of automatic grant adjustments, recipients must be given the opportunity to assert factual errors. The regulations thus recognize that even across-the-board reductions, such as that involved in the shelter allowance context, may raise individual fact questions.

Defendants also contend that estoppel is not a valid ground for contesting actions of governmental officials taken pursuant to statutory or regulatory authority. *Gavigan v. McCoy*, 37 N.Y.2d 548, 552, 375 N.Y.S.2d 858, 861, 338 N.E.2d 517, 520 (1975). It is true that estoppel is available as a defense

only when a governmental official has acted "wrongfully or negligently". *Bender v. New York City Health and Hospitals Corp.*, 38 N.Y.2d 662, 668, 382 N.Y.S.2d 18, 20–21, 345 N.E.2d 561, 564 (1976). However, even this narrow standard admits the possibility that the defense may be successfully asserted by a recipient depending on the circumstances under which his shelter allowance was initially set. At least two courts have held that community welfare agencies were estopped from reducing a shelter allowance as a result of the recipient's reliance on representations made by the agency. In *Wildstein v. Barbaro*, 61 Misc.2d 31, 304 N.Y.S.2d 531 (Sup.Ct. Nassau Co. 1969), the Nassau County Department of Social Services approved a shelter allowance in excess of the statutory maximum to enable a widow to lease an apartment with special facilities to care for one of her children who suffered from cerebral palsy. Six months later, the Department advised the recipient that it would no longer pay an allowance in excess of the maximum. The court held that, since the Department had discretion to pay an amount above the statutory maximum at the time the lease was signed, it was estopped from reducing the amount of the shelter allowance until the lease expired. Similarly, in *Mayor and Franciscovitch v. Toia*, No. 20113–76 (Sup.Ct. N.Y.Co. March 1977), which involves members of this class, the court ruled that the State and City Commissioners of Social Services were estopped by their approval of the recipient's lease from reducing the recipient's shelter allowance for the duration of the lease. Accordingly, while it is true that estoppel cannot be asserted successfully except in unusual circumstances, it is nonetheless available to plaintiffs as a defense.

Plaintiffs argue that it is "well established" that excessive hardship may entitle a recipient to prevail at a fair hearing. They rely on three 1975 New York Supreme Court decisions from Richmond County, granting welfare recipients emergency relief to pay for their rents.[9] The only au-

---

**9.** *Matter of Primont v. Dumpson*, No. 238/75 (Sup.Ct. Richmond Co., September 25, 1975);

*Matter of Seggio v. Dumpson*, No. 172/75 (Sup.Ct. Richmond Co., June 18, 1975); *Matter*

thority mentioned in these opinions as a basis for emergency relief is § 350–j of New York's Social Services Law which provides for "emergency assistance to needy families with children." However, § 350–j has been amended since the date of these decisions to bar cash payments to families eligible for Aid to Dependent Children, § 350–j(2)(c) and (3) (as amended 1977), and therefore does not any longer appear to provide a basis for continuation of rent payments here. Nevertheless, § 350–j is, by its own terms, designed to assist households with children which are faced with destitution, and therefore a recipient whose household is destitute or threatened with destitution as a result of a reduction in aid is encompassed within the purpose of the provision and entitled to benefit from it.[10] Moreover, in at least one of the fair hearing decisions received in evidence the State acknowledged that this form of emergency assistance is available under certain circumstances to recipients.[11] Accordingly, without deciding exactly what benefits are provided by § 350–j, we find that any recipient who alleges that his or her family will become destitute as a result of a reduction in benefits and requests a hearing is entitled to receive assistance under this provision at least until the time of the fair hearing.

In sum, we make the following findings as to the impact of the federal regulations on those members of the plaintiff class who receive shelter allowance as part of a federally funded program and who received notice that their benefits would be reduced

of *Jackson v. Dumpson*, No. 128–75 (Sup.Ct. Richmond Co., May, 1975).

**10.** Although § 350–j applies only to needy families with children, other provisions in New York's Social Services Law may entitle the remaining class members to emergency assistance. For instance, N.Y.Soc.Serv.Law § 302 offers various forms of emergency assistance (as set out in § 303) to aged, blind or disabled persons not eligible for emergency relief under § 350–j.

**11.** The fair hearing decision of Marsha Viverito denied her request for emergency assistance not because such relief does not exist but because her circumstances were not sufficiently severe to entitle her to this assistance:

pursuant to the 1976 amendment to the shelter allowance regulations: (1) Under the federal regulations, these recipients were entitled to aid continuing, at least until the time of the hearing, if they requested a fair hearing and alleged that defendants had made a factual error in the computation of their grants. (2) Such plaintiffs are entitled to a declaratory judgment, and it is hereby declared, that the application of 18 N.Y.C.R.R. § 358.8(c)(1) is invalid insofar as it conflicts with these requirements of federal law. (3) Moreover, defendants are enjoined from reducing the shelter allowances of these recipients in a manner contrary to that set out in the Social Security Act regulations, that is, without notice that aid will be continued if a fair hearing is requested and an error in computation alleged within the ten day "timely notice period."[12]

## IV.

### Due Process Requirements

Plaintiffs also contend that the fact/policy distinction embodied in 18 N.Y.C.R.R. § 358.8(c)(1) is "inherently unworkable" as a means of satisfying the requirements of due process. They argue that the examples of the shelter allowance reductions and the Home Relief terminations, in which factual issues were overlooked, establish that defendants are unable to determine in advance of a hearing whether a change in aid raises only law or policy issues.

"It should be noted that appellant contends that the agency should continue her shelter allowance unchanged as emergency assistance to families with dependent children. Appellant's mortgage payments were up to date as of September 1, 1976. Appellant is not faced at this time with foreclosure or eviction nor is she in an emergent situation. Therefore, appellant's contention is without merit." Defendant's Exhibit 53.

**12.** Whether aid must be continued until the issuance of a fair hearing decision, as contended by plaintiffs, or only until the hearing itself is discussed below. *See* p. 1133 *infra.*

*Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) is the starting point for a consideration of when a hearing is constitutionally required prior to a termination of public assistance benefits. In *Goldberg,* the Supreme Court held that welfare recipients have a "statutory entitlement" to public assistance and, therefore, "where recipients have challenged proposed terminations as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases", they are entitled as a matter of due process to a pre-termination evidentiary hearing. *Id.* at 262, 268, 90 S.Ct. at 1020.[13] However, the Court declined to decide what process is due when "there are no factual issues in dispute or where the application of the rule of law is not intertwined with factual issues." *Id.* at 268, n. 15, 90 S.Ct. at 1020 n. 15.

The question left open in *Goldberg* —whether a pre-termination hearing is necessary when a change in aid raises only questions of law or policy—has been answered in this Circuit in the negative. *Russo v. Kirby,* 453 F.2d 548 (2d Cir. 1971). In *Russo* striking communications workers challenged the termination of their welfare benefits solely on the ground that the state law denying public assistance to strikers was unconstitutional. The Court of Appeals held that:

"[T]he clear purpose of *Goldberg* hearings is to give eligible recipients an opportunity to prove the facts of their eligibility before their benefits are terminated, 397 U.S. at 264–267, 90 S.Ct. 1011. A hearing would be required, for example, if some of the recipients denied that they were strikers. The dispute here is on a point of law and there was no occasion for a hearing on the point." *Id.* at 551.

Accord, *Rasmussen v. Toia,* 420 F.Supp. 757, 769–70 (S.D.N.Y.1976); *Whitfield v. King,* 364 F.Supp. 1296, 1302 (M.D.Ala.1973), *aff'd mem.,* 431 U.S. 910, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977); *Provost v. Betit,* 326

F.Supp. 920, 922 (D.Vt.1971). See also *Schneider v. Whaley,* 541 F.2d 916, 920 (2d Cir. 1976).

In light of the holding in *Russo,* we are reluctant to strike down the fact/policy distinction altogether, particularly on the somewhat slender record in this case. Despite plaintiffs' contentions, New York State's experience in two areas is not sufficient to support a universal rule that any change in public assistance will necessarily involve a mixture of factual and legal issues. The variety of welfare programs and possible changes in these programs is potentially too wide to predict, on the basis of the evidence in this case, whether some of them may or may not genuinely involve changes of policy of, for example, the nature described in *Russo* and *Rasmussen v. Toia, supra.* Accordingly, this decision is limited to consideration of what procedures were constitutionally required in implementing the public assistance reductions for which there is evidence in this record. Since the amendments to the Home Relief statute have been found unconstitutional, *Tucker v. Toia, supra,* 400 N.Y.S.2d 728, 371 N.E.2d 449, any claims for relief based on the implementation of revised Soc.Serv.Law § 158 have become moot. This leaves for decision only the question of what constitutional safeguards the shelter allowance recipients are entitled to.

### A. *Standard of Review*

At the outset, we deal with defendants' contention that the applicable constitutional standard for determining the procedural rights of the shelter allowance recipients is the "risk of erroneous deprivation", as set out in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Defendants argue that, because the number of proven errors in reductions of shelter allowance was extremely low in comparison to the total number of reductions, the risk of error in the current procedure is too minor to

---

**13.** This requirement was subsequently extended to reductions as well as terminations in welfare grants. *Burr v. New Rochelle Housing Authority,* 479 F.2d 1165 (2d Cir. 1973); *Alme-* *nares v. Wyman,* 453 F.2d 1075, 1082 (2d Cir. 1971), *cert. denied,* 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1973).

warrant imposition of additional safeguards. However, defendants' reliance on *Mathews* is misplaced. *Mathews* involved termination of Social Security disability benefits, and the Supreme Court there emphasized that the procedures required prior to reduction or termination of such a non-subsistence form of relief were not as broad in scope as those called for in the welfare context considered in *Goldberg v. Kelly. Id.* 397 U.S. 340–43, 90 S.Ct. 1011. Here, where a reduction in benefits affects a recipient's ability to subsist with any semblance of decency, the degree of individual hardship is too great to be balanced away.

### B. Shelter Allowance Reductions

The shelter allowance recipients fall into two categories. As discussed above, a large number of class members receive shelter allowance as part of federally funded assistance programs, and, as to them, the 1976 reductions must be implemented in accordance with the procedures set out in the federal regulations. Home Relief participants also receive shelter allowances, N.Y. Soc.Serv.Law § 131–a, and, since Home Relief is wholly state funded and administered, these class members are not protected by the federal statute and regulations. However, where, as here, a reduction in assistance raises at least three issues of fact or mixed fact and law, we believe that even the Home Relief participants who receive shelter allowance are constitutionally entitled, at a minimum, to procedures approximating those set out in the federal regulations. The question remains whether all shelter allowance recipients, that is, both Home Relief and federal program participants, are constitutionally entitled to any greater safeguards than those set out in the federal regulations.

In the context of an "automatic grant adjustment", such as the shelter allowance reductions, the federal regulations place the burden on the welfare recipient of alleging a factual issue in order to receive a continuation of benefits pending a hearing. 45 C.F.R. § 205.10(a)5. Several courts have expressed concern with the "plight of the unsophisticated welfare recipient who . . . is burdened with the task of artfully pleading a 'fact' as opposed to a 'policy' appeal,' *Burlingame v. Schmidt*, 368 F.Supp. 429, 434 (E.D.Wisc.1973). Most relevant to the facts here is *Yee-Litt v. Richardson*, 353 F.Supp. 996 (N.D.Cal.) aff'd mem., 412 U.S. 924, 93 S.Ct. 2753, 37 L.Ed.2d 152 (1973), in which California regulations, similar to New York's 18 N.Y.C.R.R § 358.8(c)(1) were challenged, *inter alia*, on the ground that requiring a welfare recipient to plead facts "places an unfair burden on a class of people unable to sustain that burden thereby depriving them of their right to a hearing." *Id.* at 998

At the outset of the litigation in *Yee-Litt* the court issued a restraining order against any pre-hearing terminations or reductions of benefits to welfare recipients who had filed timely appeals. Subsequently, the court modified its order to permit the State to implement new regulations which, by increasing contact between welfare recipients and case workers, were designed to reduce the possibility of erroneous decisions by the State and to relieve recipients of their pleading burden. Following a ten-month trial period, the court rejected the new regulations finding that they did not preclude the possibility of erroneous refusals of aid continuing As a result of the failure of this experiment, the court concluded that "the fact-policy distinction is not viable in the welfare context for making the critical determination of whether aid will be paid pending a hearing." *Id.* at 1000.

In the case at hand, the three issues of fact and mixed fact and law available to the shelter allowance recipients are: error in family size, estoppel and possible emergency or hardship. While a recipient should experience no difficulty in alleging an error in family size, the ability to plead successfully a mixed issue of fact and law such as estoppel or a judgmental condition such as emergency is far more problematic. Even if the Department of Social Services could frame a notice explaining these concepts, it is doubtful whether the recipient could be expected to understand it. Dr. Dumpson

testified that the level of understanding of "bureaucratic jargonese" among public assistance recipients, most of whom have only an eighth grade reading comprehension, is extremely low. (Tr. Aug. 30) Moreover, the testimony concerning the Home Relief questionnaires brought home forcefully the extent to which even simple propositions may be misunderstood by the recipient. Under the circumstances, we agree with the court in *Yee-Litt* that imposing the burden of pleading facts on the shelter allowance recipients is to deprive them unfairly of the right to a hearing.

A subsidiary question left for decision is whether aid may be terminated at the hearing if it is determined at that time that a recipient has raised only an issue of law or policy, or whether aid must be continued until the issuance of the hearing decision. Plaintiffs contend that, in New York State, a hearing examiner has authority only to make recommendations and not to render final decisions. Accordingly, they argue that the defendants should be enjoined from terminating aid prior to the issuance of a fair hearing decision.

■ The only evidence of record as to the operation of New York's fair hearing system is plaintiffs' brief cross-examination of Peter Mullany, Assistant Counsel in charge of New York State's Fair Hearings Unit. Although Mullany agreed, in general terms, with plaintiffs' characterization of the role of the hearing examiner (Tr. Sept. 43–44), the record is too scanty on this point to support plaintiffs' sweeping conclusion that no final decision may be rendered by a hearing examiner. Therefore, on the evidence here, we find no basis to preclude a hearing examiner from terminating aid continuing to any recipient who, at the hearing, is found to raise only an issue of law or policy. However, as to any factual dispute, such as family size, estoppel or emergency, the federal regulations, 45

C.F.R. § 205.10(a)(6)(i), require that aid be continued until the hearing decision is issued, and defendants provide no reason why this procedure should not be followed here. Indeed, issues of estoppel or emergency, which involve a mixture of factual and legal considerations, are inherently more difficult to evaluate and therefore better suited to treatment by a policymaking official. Moreover, Commissioner Dumpson testified that only a high level official, such as the City Commissioner, is authorized to require a continuation of benefits in such cases. (Tr. Aug. 21–24) Accordingly, recipients who raise these or other factual issues are entitled to a continuation of benefits until the fair hearing decision is issued.[14]

### Conclusion

■ We are sensitive to the fact that the amendments to the shelter allowance program were prompted by the State's severe financial problems and that our determination will impose some additional burden on the State. Such a burden should not be imposed lightly by the courts and has not been imposed lightly here. However, the issue before us as to the constitutionality of the procedure used in implementing the shelter allowance reductions is not to be decided by balancing the State's interests against those of plaintiffs. Rather, it is determined by measuring the impact of the proposed method of reduction on the plaintiffs. Plaintiffs are, by definition, the least fortunate and often the least educated of the State's citizens. To deprive them of so basic a need as shelter under conditions which do not assure that they understand their rights to resist the reduction or have an adequate opportunity to present their position would be clearly to deprive them of due process.

In sum, we find that all plaintiffs who are recipients of shelter allowance are enti-

---

14. Left for decision is the question whether plaintiffs are entitled to relief on their claim that the fact/policy distinction set out in 18 N.Y.C.R.R. § 358.8(c)(1) deprives them of equal protection of the laws. This issue has been addressed sparingly, to say the least, by both sides. To the extent that we understand the claim, we believe that it must be denied. That the fact/policy distinction proves unworkable in operation may deprive plaintiffs of procedural safeguards; it does not, however, establish that the *classification* is necessarily irrational.

tled as a matter of due process to notice that, if they timely request a fair hearing, their aid will be continued either until the fair hearing is held or until the fair hearing decision is issued, as set out above.

The above constitutes our findings of fact and conclusions of law.

Submit order on five days notice.