OPINION OF THE COURT
Sheila Abdus-Salaam, J.
“All of our people all over the country — except the pure- *336 blooded Indian — are immigrants or descendants of immigrants, including even those who came over here on the Mayflower.”[1] This sound reminder was delivered to Americans by President Franklin D. Roosevelt in a 1944 campaign speech. Over 50 years later, Congress, a body comprised of those descendants of immigrants, has enacted a bill which eliminates Medicaid coverage for many legal immigrants. New York State has followed Congress’ lead.
This is a declaratory judgment action which challenges certain aspects of New York’s Welfare Reform Act of August 4, 1997 (WRA). That Act amended New York’s State-funded Medicaid program to eliminate Medicaid coverage for many lawful immigrants. Plaintiffs Mohammed Aliessa, Helen Nicola, Dotsya Kholodenko, Debora Vecherebina and Rasulan Ally allege that they are persons residing under color of law (PRUCOLs),[2] who, but for their immigration status, would be eligible for Medicaid benefits. Plaintiffs Abdul Monir and Pajan Kaur allege that they are lawful permanent residents, who, but for their immigration status, would be eligible for Medicaid benefits.
BACKGROUND
New York State Social Services Law § 122, part of the New York State Welfare Reform Act of 1997 (L 1997, ch 436, part B), was enacted subsequent to and in response to the Federal Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 USC § 1601 et seq. [PRWORA]). Under the PRWORA, Federally funded Medicaid is no longer provided to certain aliens, including most lawful permanent residents, who entered the United States on or after August 22, 1996 (the date that the PRWORA was enacted), or to most PRUCOL immigrants.
*337 Before the enactment of the WRA, New York’s State-funded Medicaid program provided Medicaid to those groups of residents, including legal immigrants, that were not eligible for Federally funded Medicaid. New York residents who are entitled to Federally funded Medicaid coverage include the disabled, the blind, the elderly, children, pregnant women, single parent families and parents of children where there is a “deprivation factor” in the household (42 USC § 1396 et seq.). The State-funded Medicaid program provides coverage to residents between the ages of 21 and 65 who are not blind or disabled or taking care of minor children, but whose resources fall below the New York State’s Public Assistance “standard of need” as defined in the Social Services Law.
Prior to enactment of the WRA, State-funded Medicaid coverage was available to aliens who were lawfully admitted for permanent residence and for PRUCOLs. However, after the PRWORA was enacted, the WRA amended New York’s State-funded program to eliminate or curtail coverage for most legal immigrants who were no longer entitled to Federally funded Medicaid under PRWORA. An exception was carved out for Medicaid recipients who, as of August 4, 1997, were in nursing homes or diagnosed with AIDS (Social Services Law § 122 [1] [c]).
As a general rule, Social Services Law § 122 does not link eligibility to PRUCOL status, but provides that eligibility depends on whether the alien is a “qualified alien” under the PRWORA and whether the qualified alien entered the United States on or after August 22, 1996. The PRWORA defines a “qualified alien” in substance as follows: (1) an alien who is lawfully admitted for permanent residence under the Immigration and Nationality Act (8 USC § 1101 et seq.); (2) an alien who is granted asylum under section 208 of such Act (8 USC § 1158); (3) a refugee who is admitted to the United States under section 207 of such Act (8 USC § 1157); (4) an alien who is paroled into the United States under section 212 (d) (5) of such Act for a period of at least one year (8 USC § 1182 [d] [5]); (5) an alien whose deportation is being withheld under section 243 (h) of such Act (8 USC § 1253 [h]); (6) an alien who is granted conditional entry pursuant to section 203 (a) (7) (8 USC § 1153 [a] [7]) of such Act as in effect prior to April 1, 1980; (7) an alien who is a Cuban and Haitian entrant; or (8) certain aliens who have been battered or subjected to extreme cruelty. (8 USC § 1641 [b], [c].) Social Services Law § 122 incorporates the definition of qualified alien by reference (Social Services Law § 122 [1] [b] [i]).
*338 PRUCOLs are not necessarily “qualified aliens” as defined above. In general, an alien who is not a qualified alien is only eligible for Medicaid coverage of services necessary to treat an emergency medical condition (Social Services Law § 122 [1] [c] [ii]; [e]). As noted, the statute does afford Medicaid coverage to otherwise unqualified aliens who, as of August 4, 1997, were in receipt of Medicaid coverage and were residing on that date in a residential health care facility licensed by the Department of Health or in a residential facility licensed, operated or funded by the State Office of Mental Health or Office of Mental Retardation and Developmental Disabilities, and aliens who on such date were diagnosed as having AIDS (Social Services Law § 122 [1] [c]). Aliens in these two groups may continue to receive the Medicaid benefits that they were receiving on August 4, 1997.
The PRWORA establishes full Medicaid eligibility for certain qualified aliens who entered the country prior to August 22, 1996, including veterans, refugees and Cuban/Haitian immigrants. These individuals are entitled to coverage for a seven-year period (8 USC § 1612 [b] [2] [A] [i] [I]-[V]). After this seven-year period, the States have the option to limit coverage to emergency care and services. However, New York determined to continue eligibility for these groups of aliens (Social Services Law § 122 [1] [b] [i]).
Regarding certain qualified aliens who entered the country on or after August 22, 1996 (this would include plaintiffs Monir and Kaur) the PRWORA only temporarily disqualifies them (for a five-year period) from receiving full coverage (8 USC § 1613 [a]). New York State chose the option of providing these aliens with full eligibility at the end of the five-year period (Social Services Law § 122 [1] [b] [ii]).
None of the plaintiffs here meet the eligibility requirements of section 122. Each plaintiff has described very serious, potentially life-threatening medical conditions. For example, plaintiff Abdul Monir is a 61-year-old lawful permanent resident who suffers from end-stage renal disease which requires kidney dialysis twice weekly, and many prescription medications. Although he satisfies the Medicaid program’s other eligibility requirements, he was denied coverage due to his immigration status. Plaintiff Dotsya Kholodenko is a 77-year-old PRUCOL. She is said to suffer from many serious chronic illnesses, including mitral stenosis, hypertension and arthritis. She needs several prescription medications and regular medical attention. However, her application for Medicaid was denied solely because of her immigration status.
*339 Each plaintiff allegedly meets the Medicaid program’s financial eligibility requirements. However, they allege that solely due to their immigration status, and the change in the law effected by the Welfare Reform Act of 1997, they are not eligible for State-funded Medicaid coverage. Plaintiffs claim that Social Services Law § 122 violates their constitutional rights under sections 1 and 3 of article XVII of the New York State Constitution, and the Equal Protection Clauses of the United States and New York State Constitutions.
The action is styled as a class action, with the proposed class defined as “All Lawful Permanent Residents who entered the United States on or after September 22, 1996[3] and all Persons Residing [in the United States] Under Color of Law (PRUCOLs) who, but for the operation of New York Social Services Law § 122, would be eligible for Medicaid coverage in New York State.” (Amended complaint 21.) The complaint seeks a declaratory judgment declaring defendant’s policy and practice of denying or terminating plaintiffs’ Medicaid benefits solely as a result of their immigration status to be unlawful; preliminarily and permanently enjoining defendant’s policy and practice; directing defendant to reimburse the plaintiffs and all other class members who were wrongfully terminated and/or denied Medicaid coverage for the cost of their medical care and medications paid for as a result of the discontinuance or denial of their Medicaid coverage; and an award of attorneys’ fees.
Defendant has moved for an order pursuant to CPLR 3211 (a) (7) dismissing the complaint for failure to state a cause of action, or in the alternative, for an order pursuant to CPLR 3212 granting summary judgment in defendant’s favor. Plaintiffs oppose the motion and seek summary judgment in their favor (CPLR 3212 [b]). Plaintiffs Aliessa, Nicola and Monir have obtained preliminary injunctive relief from the court pending determination of this motion.
EQUAL PROTECTION UNDER THE UNITED STATES
AND NEW YORK STATE CONSTITUTIONS
Plaintiffs argue that Social Services Law § 122 must be subjected to “strict scrutiny”, while defendant asserts that a rational basis analysis would be appropriate. This court is persuaded that a strict scrutiny analysis must be applied here.
*340 In Graham v Richardson (403 US 365 [1971]), the Supreme Court held that State welfare laws which conditioned benefits on citizenship and duration of residency violated the Equal Protection Clause of the Fourteenth Amendment to the Constitution. The Court noted that it has long been settled that the Equal Protection Clause entitles both citizens and aliens to the equal protection of the laws of the State in which they reside, and that “the Court’s decisions have established that classifications.based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny” (403 US 365, 371-372). Thus, wrote Justice Blackmun, “[a]liens as a class are a prime example of a ‘discrete and insular’ minority (see United States v. Carotene Products Co., 304 U. S. 144, 152-153, n. 4 (1938)) for whom such heightened judicial solicitude is appropriate.” (403 US 365, 372.)
This application by the Supreme Court of strict judicial scrutiny when reviewing State legislation with respect to public assistance benefits afforded to aliens is in contrast with the Court’s application of a rational basis test when reviewing a Federal statute involving public assistance to aliens. In Mathews v Diaz (426 US 67 [1976]), the Court upheld the constitutionality of a Federal Social Security Act provision that conditioned an alien’s eligibility for benefits on continuous residence in the United States for five years and admission for permanent residence, holding that this statutory classification did not violate the Fifth Amendment’s Due Process Clause. In framing the issue before it, the Court wrote: “The real question presented by this case is not whether discrimination between citizens and aliens is permissible; rather, it is whether the statutory discrimination within the class of aliens — allowing benefits to some aliens but not to others — is permissible.” (426 US 67, 80.)
The Mathews Court applied a rational basis analysis and concluded that neither the five-year residency requirement nor the admission for permanent residency requirement imposed by Congress was totally irrational. The Court noted that there is a “distinction between the constitutional limits on state power and the constitutional grant of power to the Federal Government” (426 US 67, 85, supra), and rejected plaintiff’s argument that it is “ ‘political hypocrisy’ to recognize that the Fourteenth Amendment’s limits on state powers are substantially different from the constitutional provisions applicable to the federal power over immigration and naturalization.” (426 US 67, 86-87.)
*341 Although defendant here recognizes that the Graham Court held that State-made distinctions on the basis of alienage are subject to strict scrutiny rather than a rational basis analysis, defendant urges that since Social Services Law § 122 was enacted pursuant to congressional policy (the PRWORA), this factor militates in favor of review under the rational basis analysis. Defendant cites to dicta in Plyler v Doe (457 US 202, 224 [1982], reh denied 458 US 1131 [1982]), in which the Supreme Court expressed agreement with the proposition that when the courts are faced with an equal protection challenge respecting the treatment of aliens, they must be attentive to congressional policy, and that “the exercise of congressional power might well affect the State’s prerogatives to afford differential treatment to a particular class of aliens.” However, this observation by the Plyler Court does not stand for the proposition that a rational basis test is to be applied here, nor does it indicate a retreat from the analysis applied in Graham {supra).
As was noted in In re Griffiths (413 US 717, 721 [1973]), “[t]he Court has consistently emphasized that a State which adopts a suspect classification ‘bears a heavy burden of justification,’ McLaughlin v Florida, 379 U. S. 184, 196 (1964)”. Social Services Law § 122 cannot withstand a strict scrutiny analysis, much like the State law in Graham {supra) could not survive such an analysis. Section 122 (as did one of the statutes at issue in Graham [supra]) creates classifications of legal aliens and restricts the availability of public assistance benefits based upon those classifications. Defendant argues that as a practical matter, in view of the PRWORA, in order to provide Medicaid for previously eligible aliens now no longer considered qualified aliens, the State would have to completely self-fund Medicaid for these individuals (according to defendant, the Federal Government contributes 50% of the funding for eligible individuals). Defendant argues that this would result in a substantial financial burden, and that in order to meet this burden, the State would have no choice but to allocate monies from other social services programs, reduce benefits to all Medicaid recipients, or otherwise increase revenues through taxes, fees, etc.
Here, as was the case in Graham {supra), fiscal concerns and the distribution of limited resources are raised as justifications for denying some legal aliens public assistance. In finding these justifications inadequate when strict scrutiny is applied, Justice Blackmun wrote:
*342 “[A]s the Court recognized in Shapiro [v Thompson, 394 US 618, 633]:
“ ‘[A] State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens * * * The saving of welfare costs cannot justify an otherwise invidious classification.’ 394 U. S., at 633.
“Since an alien as well as a citizen is a ‘person’ for equal protection purposes, a concern for fiscal integrity is no more compelling a justification for the questioned classification in these cases than it was in Shapiro.” (Graham v Richardson, 403 US 365, 374-375, supra.)
Defendant also stresses that Social Services Law § 122, as part of New York’s Welfare Reform Act of August 4, 1997, was enacted pursuant to and in furtherance of the policies articulated in the PRWORA. Defendant points to the preamble to the PRWORA, which provides, in part, as follows: “With respect to the State authority to make determinations concerning the eligibility of qualified aliens for public benefits * * * a State that chooses to follow the Federal classification in determining the eligibility of such aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy.” (8 USC § 1601 [7].) However, this pronouncement from Congress does not serve to save the statute from a constitutional challenge. The Supreme Court in Graham (403 US 365, 382, supra) held that “[a]lthough the Federal Government admittedly has broad constitutional power to determine what aliens shall be admitted to the United States, the period they may remain, and the terms and conditions of their naturalization, Congress does not have the power to authorize the individual States to violate the Equal Protection Clause.” (Emphasis supplied.)
In relying upon the mandates of Congress, as defined by the PRWORA, defendant finds itself between a rock and a hard place, a problem that is insightfully addressed in a 1997 Harvard Law Review article[4] which deals with the PRWORA and equal protection issues. The article notes, with relevance here, as follows:
*343 “During the 1996 campaign, immigrants and welfare recipients sustained repeated political attacks from candidates seeking to capitalize on voter anxiety about job security and the decay of the nation’s welfare system * * * But although most calls for cuts in benefits to aliens have been aimed at illegal immigrants, a new dynamic emerged in 1996 that put legal immigrants in the crosshairs of policy makers and political candidates.
“This assault on legal immigrants came to fruition in the Personal Responsibility and Work Opportunity Act of 1996, the massive welfare reform bill passed by the Congress and signed into law by President Clinton on August 22, 1996. The law is projected to save an estimated $55 billion over six years, largely because of the reduction in benefits for legal immigrants. But title 4 of the law — the section that deals with aid to legal immigrants — drags the federal government and the states through a constitutional minefield. First, title 4 invites the states to violate the Equal Protection Clause of the Constitution. Second, title 4 forces the federal government to offend important equal protection principles by eliminating crucial federal aid programs for legal aliens.” (110 Harv L Rev, op. cit., at 1191-1192 [emphasis supplied].)
Significantly, the article points out that the Supreme Court has “explicitly held that Congress may not pass laws that authorize states to dilute the equal protection guarantee. In Katzenbach v Morgan [384 US 641 (1966)], the majority stated that Congress may not ‘restrict, abrogate, or dilute’ any Fourteenth Amendment rights. In effect, Morgan, like Graham, prohibits Congress from giving states permission to curtail equal protection. Thus, sections 402 (b) and 412 of the welfare bill invite states to cut aid to legal immigrants in a way that runs afoul of Graham, Morgan, and the Equal Protection Clause.” (110 Harv L Rev, op. cit., at 1194.)
Thus, based upon the foregoing analysis, defendant cannot find refuge behind the policy expressed by Congress in the PRWORA when met with an equal protection challenge to a State statute that discriminates against many legal immigrants and places vital public assistance benefits beyond their reach.
*344 Accordingly, this court concludes that Social Services Law § 122 violates the Equal Protection Clauses of the United States and New York State Constitutions.
Further, plaintiffs have also demonstrated that the statute violates section 1 of article XVII of the New York State Constitution. That section requires the State to provide aid, care and support for the needy. In fact, the declaration of the objectives of “Medical Assistance for Needy Persons” in New York State provides, inter alia, that such assistance is “declared to be a matter of public concern and a necessity in promoting the public health and welfare and for promoting the state’s goal of making available to everyone, regardless of race, age, national origin or economic standing, uniform, high-quality medical care.” (Social Services Law § 363 [emphasis supplied].)
In Tucker v Toia (43 NY2d 1, 7), the Court of Appeals pronounced that “[i]n New York State, the provision for assistance to the needy is not a matter of legislative grace; rather, it is specifically mandated by our Constitution” and found that “[t]he legislative history of the Constitutional Convention of 1938 is indicative of a clear intent that State aid to the needy was deemed to be a fundamental part of the social contract.” (Supra, at 7.) The Court posed the question: “May the Legislature deny all aid to certain individuals who are admittedly needy, solely on the basis of criteria having nothing to do with need?” (43 NY2d 1, 9), and answered that question in the negative.
In Minino v Perales (168 AD2d 289, affd 79 NY2d 883), the First Department declared invalid a statute which denied sponsored legal aliens benefits under the Home Relief Program based upon a “deeming” provision that provided that for three years after the alien’s entry into this country, the income of the sponsor is deemed available to the alien, whether or not the income is in fact available. The Court, citing Tucker v Toia (supra), found that the Legislature could not avoid the constitutional mandate to aid the needy by denying aid solely on the basis of criteria having nothing to do with need, such as the “deeming” provision of that statute.
Defendant argues here that the State is meeting its obligations to the needy who are not eligible for Medicaid through other programs, such as the Safety Net Assistance Program, and by providing “emergency” Medicaid to those otherwise ineligible. Thus, defendant attempts to distinguish Tucker v Toia (supra) and Minino v Perales (supra), where the Courts were
*345 faced with statutes that completely denied benefits, from the situation here, where other benefits may be afforded to plaintiffs. However, as is noted by defendant with respect to the provision of “emergency” Medicaid: “Emergency medical conditions are * * * sudden, severe and short-lived physical injuries or illnesses that require immediate treatment to prevent further harm. Greenery Rehabilitation Group v. Hammon, 150 F.3d 226, 232 (2d Cir. 1998). For example, a sudden and severe head injury incurred in a car crash can create an emergency medical condition; however, once the patient’s condition stabilizes, the emergency ends. Although the patient may require long-term nursing facility care, such care does not qualify as care necessary to treat an ‘emergency medical condition.’ Id at 233.” (McCloskey affidavit H 12.) By defendant’s admission, emergency Medicaid is not available to help all needy residents, including plaintiffs, most of whom have chronic health conditions, and one of whom (plaintiff Aliessa) was injured in a car accident and requires long-term care in a facility.
Regarding the Safety Net Assistance Grant, the relatively small amounts that are provided (see, Social Services Law § 131-a) do not constitute required care for the needy such as plaintiff Monir, who claims that his hospital costs were over $2,000 per day. Further, the Safety Net Assistance Program only provides cash assistance for two years in a lifetime. Thus, those needy persons with chronic illnesses would not receive any cash after that two-year period had run.
Based upon the foregoing, it is concluded that Social Services Law § 122 does not meet the constitutional mandate of article XVII, § 1 of the New York Constitution.
plaintiffs’ request for summary judgment
The court has concluded that plaintiffs are entitled to a declaratory judgment as prayed for in their complaint. Further, a permanent injunction is granted with respect to plaintiffs, as is an order directing defendant to reimburse them for expenses that would have been covered and paid for through Medicaid, if such assistance had in fact been provided.

. Bartlett, Familiar Quotations, at 973 (14th ed).

. Plaintiffs’ amended complaint defines the term PRUCOL as follows: “PRUCOL refers to those immigrants who are ‘permanently residing under color of law,’ or people who are residing in the United States with the knowledge of/or permission of the Immigration and Naturalization Service (INS). The General Accounting Office defines PRUCOL as ‘an umbrella term used for aliens who are legally residing in the United States but who do not fit into other alien categories.’ See Medicaid: Demographics of Nonenroiled Children Suggest Outreach Strategies, GAO/HEHS-98-93 at 6 (March 1998) (emphasis added); see also 42 C.F.R. § 435.408. The New York State Department of Health interprets the term PRUCOL to include all ‘individuals known to the INS who are neither citizens nor aliens lawfully admitted for permanent residence * * * and whose departure the INS does not contemplate enforcing’ See New York State Medical Assistance Reference Guide at 429.”

. This date is apparently a typographical error, as the PRWORA was enacted on August 22, 1996.

. Comment, Welfare Reform — Treatment of Legal Immigrants — Congress Authorizes States To Deny Public Benefits to Noncitizens and Excludes Legal *343 Immigrants From Federal Aid Programs — Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-93, 110 Stat. 2105, 110 Harv L Rev 1191; see also, Hoke, State Discretion Under New Federal Welfare Legislation: Illusion, Reality and a Federalism-Based Constitutional Challenge, 9 Stan L & Pol’y Rev 115.